Jane Doe 1 v. Eastern New Mexico University 252044. Your Honors, my name is Jim Davey. I represent the Jane Does. May it please the Court. Schools violate Title IX when they have noticed that sexual harassment or abuse is likely to occur in a context they control and they do nothing to stop it. The District Court here erred because it said no reasonable jury could believe that Eastern New Mexico University could control a non-employee at an off-campus home. But control is a fact-intensive inquiry and there are no bright-line rules about employee status or the campus survey line. Here the non-employee was a coach's spouse whom the coach required her players to see for treatment that provided cover for sex abuse. The off-campus home was the coach's and was a frequent site of required team activities. Under the circumstances, a reasonable jury could conclude that the school had control that it did not exercise and this Court should therefore reverse. What if the control over the harasser would not contribute to the assault, to the injury? Sorry, meaning? In other words, under Davis, as I understand it, the issue is does the school have control over the harasser in the context? Davis, yes, your honor. Davis requires control over both the harasser and the context. Right. And so my question is, well what if the control over the harasser, you have, for example, no trespass. You can say, don't come to the school, but he's not assaulting kids at the school. He's assaulting kids at his home and presumably the school didn't have the power to say, Glenn, you can't stay at your house. And so what if you have control over the harasser, but the control over the harasser would not contribute to the injury? I have a legal answer and a fact answer, your honor. The legal answer is that, as this Court said in Farmer and as this Court has said in other cases, it's actually about the school's control making students liable or more vulnerable to harassment. And here, there are numerous ways that they could have, through either telling Megan she's not allowed to require her players to see Glenn for, again, treatment that was a guise for sex abuse. They had numerous ways of controlling Glenn's access to the Jane Doe's and other student athletes. Okay, and I'm not trying to argue with you, but I want to probe you, but have you helped me understand this. What's the difference between that and saying, well, that's control over the athletic staff. You have control over Megan, you have control over the other coaches that are sending kids to Glenn, but Davis requires you to have control over Glenn himself. And so it seems to me that a lot of your arguments, play devil's advocate, seem more proximate cause arguments. We could have prevented the injury by exercising our control over the athletic staff like Megan, but that's not what Davis calls for. Certainly, and I guess that brings me to my fact answer. My fact answer is that they asserted people in Glenn's position. Glenn was a volunteer at the athletic department. He was providing training as a volunteer to the athletic department. And at J350, there's testimony, there's a volunteer policy. They're supposed to vet these people. But you have to sign the policy. That's what Mr. Weir wanted him to do, and he said, not so much. But that gets to deliberate indifference, your honor. I think that if the school is asserting control over people in Glenn's position, volunteers that are accessing their student athlete community, the school is saying, we have control over people in these positions. Them failing to exercise that doesn't get the school off the hook. That speaks to the school's deliberate indifference under Title IX. I would also say, your honor, you brought up the no trespass order. The question of the no trespass order, it's a fact question about effectiveness. And here, where the no harassment, I think a reasonable jury, at minimum, could believe that if they had issued it earlier, regardless of whether it speaks to the home or the campus or whatever, it's a shot across the bow. It's a signal that he's under investigation. And it's directing him to have no further contact with the students and the campus, the campus community. And in that context, especially here, where it did, in fact, work, there was no additional abuse after the no trespass order belatedly did issue, a reasonable jury could believe that if they'd issued it sooner, it would have stopped the abuse sooner. And so, again, I guess I have a law answer and a fact answer. And under either circumstance, summary judgment would be inappropriate. I'm struck, when they talk about control over the harasser, they don't say direct control. And there's all kinds of ways that you can control someone that is not direct. Let's say that you have a child that is a diabetic and you're trying to control that child from eating candy. I suppose you could directly control it by putting handcuffs on the kid and saying, while you're at home, you're not going to be able to snatch candy. You could similarly control the child's ability to eat candy at home by taking candy away from the child. So in this particular case, it seems to me, without the word direct in the course of instruction, you could say, yes, they had control over Glenn in the sense that they limited options that Glenn had. Yeah, I agree. And that was an indirect way of controlling Glenn. And it kind of conflates control over the harasser and control over the context. But there's nothing in the court's statement about those two factors that requires them to be separate and independent. It seems one can slop over into the other. I agree with that, Your Honor. And I would actually go a step further, which is to say, if you look at Davis, if you look at cases like Dawson in the Ninth Circuit, if you look at Simpson, control over context and control over an individual. Davis is a little bit squishy on that. They're distinct, but they're related. And here, especially in, again, as Simpson talks about, as Dawson talks about in the Ninth Circuit, at Brown in the Ninth Circuit, the highly regulated context of college athletics, control over the context and control over the individual can bleed into each other a little bit. And I think Your Honor is totally correct that here they had numerous steps. I mentioned in response to Judge Bacharach's question, the volunteer protocol. There were numerous things that they could have done. They could have followed their own protocol for volunteers. Vetting on the front end probably would have caught this because he has no licenses and a self-conferred title, and his treatment had no basis in science. They could have told Megan and other coaches not to require players to see him. They could have required him to coordinate with the actual training staff who were suspicious and could have plausibly protected the students. They could have affirmatively warned students, including about Glenn and Megan, telling their student-athletes to keep his treatment secret. They could have barred him, even after the disastrous meeting in November of 2022, instead of offering more access. And ultimately, they could have... Barred him from what? Treating student-athletes. They could have made that very explicit. How could they... They could only have barred him by their control over the athletes. They could have said, athletes, we bar you from going to Glenn. But they could not have barred Glenn because they had no legal authority over him, unless you buy this argument that you can indirectly control Glenn by the environment. That is, you closely conflate those two elements together. Because if they had said... They did get a temporary restraining order, I guess, wasn't it? Some kind of... A no-trespass order, yes, Your Honor. That kept Glenn off the campus. But they probably could not have gotten such an order to prevent Glenn from having contact with athletes who voluntarily chose to go to him off campus. Certainly, Your Honor. And I guess what I would say about that is that here, the Jane Does themselves were seeing him because Megan required them to. Right. So they had that control to take away the feeder, the pipeline. Numerous and numerous other... So that controls the flow. If you want to control the oil that goes into somebody's pipe, you may not have control to go into their house and control that oil, but you might have power to cut the pipe off earlier in the flow. Yes. And here, it seems to me, unless there is the word direct in that control, which I don't see, they could have indirectly controlled it. I'm struck by the conversations among the school people about, oh, we're afraid of lawsuits, we're afraid of this and that. It seems to me that there was pretty good evidence here of deliberate indifference. They basically were saying, we are afraid of the consequences to us, and therefore, we I think that's right, Your Honor. And I would underscore, it wasn't just Megan. There were other coaches. And this is at J440 and 433. Other athletes were getting referred to him and even transported to his off-campus house by their own coaches. And so there were numerous interventions that the school could have undertaken and simply did not, which I agree gets to deliberate indifference, although that's not really before the court. It's certainly not an alternative basis for affirmance. But to come back to your question about control, employee status, Davis says that employee status is not dispositive. It's a fact-based inquiry. The real limit is control. And Simpson, which is about high school recruits, Hall, which is a Third Circuit case about a non-student boyfriend, Feminist Majority Foundation in the Fourth Circuit, which is about posters on an online social network who might be students and might not have been. It's not clear on the record. The school, the real limit is control. And again, the district court treated Glenn's employee status as almost dispositive here. And that's just not what the law says. I'm not saying that this is maybe preclusive of your argument, because obviously it's not. But the cases that you're relying on, for example, access to a school site, misconduct in a fraternity that exists by virtue of approval of the university, conduct that takes place in a dormitory with a non-student that is owned by the university, your argument of not saying it casts doubt on the logic, but it certainly would be not supported by any precedence, because all of the cases that you're relying on do involve school ownership, approval, and the like, right? I have two answers, Your Honor. One is that some of those cases do involve things that are off campus. Farmer, which affirmed Weckhorst, involved an off-campus fraternity house. That's the court's decision. Yeah, exactly. But a fraternity exists because it's approved by the university. And that's the fact part of my question, right? Which is that the school, you know, it's Glenn's home, but it's also Megan's home. It's a site of required team activities. The students are required to be there by the athletic program. They don't have control over this. They have to be there. It is exactly the sort of adjunct, you know, campus space where regulated campus activities are happening. You know, Brown, which is an en banc decision of the Ninth Circuit, also involves a private off-campus home where only students live. But because it is falling under the regulated athletic program, you know, there's possible liability there. I do want to make sure to reserve time for rebuttal also. So I'm going to sit down unless you have any further questions. We'll stop. Stop this thought. Thank you. Do you have any questions? Do you have any questions? No. All right. I'll see you on rebuttal. Good morning, Your Honor. Salish Wallace for the Capitol East. If it may please the court. Thank you. I'd like to address the idea of control and the requirement that the university had to have control and the two different aspects of the test that we must consider. The first is control over the harasser, which while it may bleed into control over context, it is a different analysis that must be performed. So context is one that we're not really going to address today because I think everybody has agreed there was some control over the context of the alleged harassment. But what we are focusing on is control over the alleged harasser and what steps the university could have taken to prevent Glenn De Los Reyes from seeing student athletes or anybody else in his private residence doing his own private work, which he did throughout the course of the day. He didn't just treat athletes. He did this as his living. Everything that the appellants have pointed to demonstrates control over students, staff, the campus. It should be noted that no treatments on any of the three plaintiffs occurred post-October of 22. Nothing. A trespass order was entered in February, and that comes after a series of events that occur where the university itself tries to exercise control to every degree possible. And Judge Wormuth did a very good job delineating each of those facts in the record. They had a meeting. Do not treat our student athletes without formalizing an agreement or having permission from our athletic training staff in order to treat our student athletes. And, of course, they followed up with that by, okay, don't do it without approval from us. Now, let's see if we can't get that approval for you. I mean, it was not much of a slap on the wrist, I didn't think. I think it was more of just an administrative request to kind of fill out a proper form before you abuse them. I think that in the context of what occurred, they didn't have the authority to, quote-unquote, slap his wrist. What they could do is try to establish a method in which they had control and authority so that they could be in substantial control over the alleged harasser. If he had signed that form, would they then have had that legal control? I believe that, yes, they would have. They would have established a relationship that would have allowed the university to have substantial control over Glenn because they would have had a formalized agreement for him. Did that formalized agreement say, and by signing this agreement, do you agree that the university has control over your activities off campus? I believe it would have bled into the university had control over all treatments provided by Glenn De Los Reyes to any student athletes. So they would have had a contract right then to have enforced him? Yes, Your Honor, they would have, but he declined. But it is important to note that even though Glenn was aware that he was being instructed to cease treating student athletes unless he formalized a professional relationship, he chose to do so anyway. On November 8th of 22, which is a full week at a minimum after the last treatment is received by any of the Jane Does, he says, well, am I going to follow the rules to see? Then an athletic trainer tells me who I can see. I'm okay, just I'll see your players still, in response to another coach. And when Defendant Weir became aware that he was still treating student athletes at home, he sent an email to all coaches, all staff, and said student athletes are not to see Glenn De Los Reyes for any treatments. So he did have the power to prevent the students from going to see Glenn. He had the power to tell his coaches that they are not to send student athletes for treatment to Glenn De Los Reyes. He also had the power to tell the basketball coach she couldn't have meetings, mandatory meetings in her house with this person waiting for the pigeons to come along. Yes, he did, but that wasn't an issue because... He said we might have a Larry Nessar situation here. That's correct. The athletic trainer, Danielle Tarasi, has testified in her deposition that she went to Paul Weir. They didn't do anything. It was when she told him, and then they did receive additional information, they had set up the meeting. And this is an important point. When Paul Weir set up the meeting to discuss all of the information that's starting to come to light, mind you, they don't have clear allegations yet. None of these plaintiffs have made a direct report. You've got to be pretty obtuse not to pick up the earlier complaints made to Mr. Weir. Where? The earlier complaints were... There was one, and it was the previous season, and a student said, I kind of felt uncomfortable. So I think that that's not sufficient information to place someone on notice that alleged sexual assaults are occurring versus uncomfortable with the form of a treatment. Multiple students saw Glenn De Los Reyes. But importantly, there is a meeting that occurs, but in the invitation for that meeting that's going to happen on November 2nd, Paul Weir sends to Megan and to the other individuals who are present that they must attend. But it's important to note that he says, and Megan, if Glenn is available and would like to join us, we invite him to this meeting. So I do want to follow up on Judge Kelly's question. So in what you had said before, so Mr. Weir did have the power to tell the coaches, including Megan, do not send any athletes for treatment, right? Correct. He had the power to say, Glenn can't set forth on the perimeter of the campus. He had the power to say to Megan, you can't have any team. I think what Judge Kelly was asking, Mr. Weir did have the power to tell Megan no team events, no mandatory events, and no training, no treatment at your house. If there's treatment for an athlete that is a member of the basketball team or the track team, they can use the facilities at the campus. He had the power to do that, right? Yes, I believe so. And so back to Judge Avell's question. So it's sort of akin to saying, okay, well, let's say you're a medical doctor. Okay, I have no control over the medical doctor. All I can take away is every single medical device that the medical doctor needs. See, you can take away his stethoscope or her stethoscope. You can take away, you know, all of the things. And so you don't have any control over the doctor, but the doctor can't practice medicine without his devices, and he has nowhere to treat anybody. He can't treat people at his house. He can't treat people at the university. He can't have anybody sending people to him. And so back to Judge Avell's question. So how do you not have, Mr. Weir, not have control over him because he can never do anything? So all of those are examples of control over the students and the staff and the campus. Students, when we say students, we're thinking kids. These are adults, and they voluntarily. None of these plaintiffs saw Glendale-Los Reyes after information was brought forth. That's important. Last treatment for the last Jane Doe plaintiff was received in October. The report comes out. The meeting's November 2nd. None of them saw him after October. So their conduct, what happened? When they got notice, they exercised control over everything they had control over. So this is a good argument that he also had control over the athletes, the people that run the gym, et cetera, but obviously that is not relevant or irrelevant. But back to Judge Avell's question, though. So how is Mr. Weir not have at least the power to exercise control? Because where is he going to treat anybody? He has nowhere to treat anybody. He can't do it at his house. Why not? Because I thought you just acknowledged that Mr. Weir had the power to tell Megan that none of the athletes could get treated, school athletes can get treated in her home. He had the authority to tell Megan she couldn't refer students for treatment to Glenn, but adult students, I don't think that Mr. Weir or anybody else has the ability to tell an adult, when they're off of campus, outside of school activities, they can't go see an independent medical or therapy provider at a location. Is there any evidence that any of the athletes went to get treated by Glenn without referrals from the coaches? Yes, yes, yes. Athletes sought Glenn out. The record is replete with even messages from other members of the women's basketball team like, hey, Glenn, can you work on my shoulder, Glenn? I'm going to be there with teammates so and so. But all of that is because Megan was telling, at the initial team meeting, she told, she had Glenn there, right? And she said, you can get treated by Glenn. She said, you can get treated by Glenn. He is available. Not a you must. But what if they did the opposite? What if the university said, we don't like this mess. It's creating a problem for us. Megan, we have control over you. We are ordering you to tell your student athletes that that is impermissible behavior for you to get treatment from Glenn. Just like you tell them, don't use drugs before a game. Don't use alcohol before a game. You have authority to do that. You have authority to tell these students, do not go to Glenn, period. If you do, you're off the team. That would solve the problem. It would have control over Glenn indirectly by their control over Megan. And that would have solved the problem. In fact, all that happened was that Dr. Weir told the coach to have him follow protocol. What does that mean? If I go in to get my shoulder worked on and I end up getting my pelvis worked on, doesn't that sort of light a light? I'm not certain that it does, depending on the type of therapy or treatment or type of athletic recovery program you're involved in. But going back to Jet-Evil for a minute, when you're talking about cutting off access, it's important to understand that no women's basketball players receive treatment from Glenn. No women's basketball players who are directly under the control of Megan receive treatment from Glenn after the November 2nd meeting. It was other sports teams' players by other coaches. And when Dr. Weir became aware of that, there was a stern email. There was action taken. And it should be noted that Megan eventually was terminated. Only after all these abuses had happened. And the lawsuit is about the people who have been abused. And that control did not be – the later exercise control merely proves it was possible. But these particular claimants are saying, but what about us? We were injured by your inactivity. And they say, oh, but our inactivity was because we didn't have control. But what about the control you did ultimately do? You're saying they had control. They exercised it. They solved the problem. But not before this cause of action was developed. They also have to consider when notice was given, when Dr. Weir was made aware of the allegations. And that was in October. No student involved in this lawsuit, not one of the Jane Doe's, received treatment after Dr. Weir became aware of the allegations. That we're going to have a Larry Nassar case on our hands. Not one of the Jane Doe's saw him again after that. The meeting occurs. They are never back in his home for any type of treatment. So didn't Weir know of some of these – surely. I mean Weir knew some of these things were being alleged before they put the restraint on the defendant. Before the no-trespass order, yes, Your Honor. But factually and then the timeline, it matters. Because the plaintiffs received treatment up until – so August, September, and October, around mid-October or so. It's not entirely clear, but we know that the last treatment as testified to by one of the Jane Doe's was in October. The reports come out. Danielle Tarassi testified. She went to Paul Weir in October and said, we're going to have a Larry Nassar case on our hands if we don't do something. The meeting is held. The plaintiffs never saw Glenn De Los Reyes for treatment again. When conduct alleged came forward, they didn't. But they actually didn't report specifically even until later. HR did an investigation. They interviewed students. That's when the plaintiffs came forward and actually disclosed their specific allegations. So you're not really relying on the fact that the university didn't have control. You are relying primarily on the argument that the university didn't have notice. There are two elements because you can't have control over a situation you're unaware of. You have to be aware that there's a problem and that there's alleged or that there could be this threat of harm to students. You have to have notice of that. And then you have to have substantial control over both the context of that harassment and the harasser. So you have to look at them in order. Yeah, but it seems to me that they – I think that we've made at least a dialogue that suggests that they might have had control if they had wanted to exercise it. But you're saying that control requires notice first, and I'm not sure anybody would quarrel with that. And that they did not – that there's nothing in this record to show that anybody of authority had notice, authority to do something, until they acted and solved the problem. But wouldn't you say that Megan had authority? Would Megan's knowledge be attributed to the university because she was a kind of a final decision maker in her job, her job of keeping her athletes well conditioned? I mean, I don't think the president of the university would say why I'm offended that you have presumed to set rules on how your students' physical behavior is being maintained. I mean, how their health is being maintained. That should have come up here to the president of the university. I should have been deciding these things. I don't think anybody would really doubt that Megan had what the university perceived as final authority over how her athletes were going to be trained. I would not dispute that, but it's important to note that Megan testified, and the record reflects she didn't have notice of the allegations against Glenn for alleged sexual misconduct until January 31st of 2023. That is well after. So there's a little bit of muddle in the facts there, but it's clear enough we know that Megan didn't know of the specific allegations of misconduct until January 31st, 2023. The meeting was held November 2nd. There's some discussion about don't work on our athletes without permission of formalized agreement, checking in with our athletic training team, make sure that everybody's on the same page, and that, the record reflects, was based on liability for injuries to students. Well, I was under the impression that in January of 2022, Danielle Tarosi raised concerns about this whole situation. In January of 2022? 2022, not 23. That's correct. Danielle Tarosi did go in and said, hey, we don't really know who this person is, and if a student gets injured getting treatment by some outside provider. Her response was tell them to follow the proper protocol. Correct, because there were no allegations of misconduct. Her concern was an unknown provider was treating student athletes. Don't we have a dispute as to exactly between what somebody was saying about whether or not anybody knew about it? Isn't there a dispute in there where some of the plaintiffs are saying they did tell them, others are saying we didn't know? No, Your Honor, I don't believe so. I don't think there's a disputed fact of the reporting and what knowledge was reported to whom and when. This is a summary judgment, correct? Correct. And I don't believe there are disputed facts that weigh on the issue because we know who reported what, what they say, and we give deference to those allegations. You're talking about 23, October of 23. No, October of 22. And you're talking about whether it was mandatory that the students come to her house and whether it was mandatory that they see this fella. And others say no, it wasn't mandatory. Isn't that a dispute? Yeah, but I don't believe it's a dispute that weighs on the decision. We just ask that you affirm the district court. Thank you. Thank you. Your Honors, I just would like to make three points on rebuttal. The first is that in January of 2022, Daniel Tarosi specifically notified Paul Weir of sex abuse. That's in the record at J496. You weren't precise. I couldn't understand you. Say that sentence again. Don't explain it. Just say it again and move on. Yes. Daniel Tarosi in the spring of 2022 specifically notified Paul Weir that sex abuse was occurring at J496. Question, did you report sexual assault or abuse to Paul Weir in the spring of 2022? Answer, yes. That was to Paul Weir. Yes. That takes care of the notice point. The second point is that I think my colleague's concession that Glenn merely signing the form would have provided the school direct control over him is fatal, even on the terms of their own argument. Because then it just gets to whether it was deliberately indifferent that they didn't follow up and actually make him sign the form. Even at this argument, they are asserting control over people who are volunteering at the athletic department. It's just a fact dispute, as Judge Kelly said, over whether or not they exercise that control. So, in other words, your argument is that if she's conceding that you have control over a contracting party, a fortiori, you have more control over somebody without any license. Not even. It's just that even at this argument, they're asserting control over people who are volunteering providing these treatments. Disclaiming it merely because he didn't sign the form and that they didn't follow up speaks to the school's deliberate indifference. It's not about whether or not they have control. My last point is just my colleague got up here. Every single argument that she made was based in facts. As Judge Kelly said, this was a summary judgment case. If we're going to stand here and argue about facts, I think that only underscores why there are numerous disputed facts that preclude summary judgment here as to control. And so, for those reasons, unless you have no further questions, I would urge you to reverse and sit down. Thank you. We'll take this matter submitted. Both counsel did an excellent job. Appreciate your advocacy.